ROBBINS GELLER RUDMAN
  & DOWD LLP
TRIG R. SMITH (237399)
NICOLE Q. GILLILAND (335132)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
trigs@rgrdlaw.com
ngilliland@rgrdlaw.com

Lead Counsel for Lead Plaintiff

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re SORRENTO THERAPEUTICS, INC. SECURITIES LITIGATION | Case No. 3:20-cv-00966-AJB-DEB |
| | CLASS ACTION |
| This Document Relates To: | CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
|     ALL ACTIONS. | |
| | DEMAND FOR JURY TRIAL |

**INTRODUCTION AND OVERVIEW**

1.     Lead Plaintiff Andrew Zenoff ("Plaintiff") hereby brings this action on behalf of himself and all persons or entities who purchased or otherwise acquired the common stock of Sorrento Therapeutics, Inc. ("Sorrento" or the "Company") between May 15, 2020 and May 21, 2020, inclusive (the "Class Period"), and were damaged thereby.  Excluded from the Class, as defined at ¶75, *infra*, are Defendants, present or former executive officers of Sorrento and their immediate family members (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and (1)(b)(ii)).  Plaintiff seeks to recover damages caused by Defendants' violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

2.     Plaintiff alleges the following based on personal knowledge as to himself and his own acts and upon information and belief as to all other matters.  Plaintiff's information and belief is based on, among other things, the independent investigation of his counsel, Robbins Geller Rudman & Dowd LLP.  This investigation included, but was not limited to, a review and analysis of:  (i) Sorrento's public filings with the United States Securities and Exchange Commission ("SEC"); (ii) transcripts of the Company's public conference calls; (iii) Sorrento's press releases; (iv) independent media reports regarding Sorrento and public statements made by its executives and officers; (v) economic analyses of Sorrento's stock price movement, pricing and volume data; (vi) consultation with relevant experts; (vii) relevant regulatory communications; and (viii) other publicly-available material and data identified herein.

3.     Counsel's investigation of the facts underlying this action continues, and counsel further believes that relevant facts are known only by Defendants (and their agents) or are exclusively within their custody or control.  Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

4.      Sorrento is, in essence, a clinical-stage biopharmaceutical company that purports to apply cutting-edge science to create innovative therapies to treat people who suffer from cancer, pain and COVID-19.  Since its formation in 2009, the Company has not obtained United States Food and Drug Administration ("FDA") approval for any drug that Sorrento developed on its own.  Prior to and during the Class Period, the Company's fundamental focus was to develop and commercialize a monoclonal antibody known as STI-1499 to treat patients suffering from COVID-19.

5.      On May 15, 2020, as the coronavirus pandemic swept across the globe, Defendants were quoted in a Fox News article touting STI-1499 as a ***100% "cure"*** for COVID-19.  The market's reaction to Defendants' claim was immediate; with the Company's stock price rocketing up to a daily high of $9.00 per share, or ***243.5% higher*** than the prior trading day's close of $2.62.  Given the global fear of coronavirus, particularly in light of the exponential growth in infections, hospitalizations and deaths, one market participant observed that Defendants' claim of having a cure for COVID-19 was "***exactly what the world wanted to hear***."  That day, moreover, an astonishing 507 million shares of Sorrento common stock traded hands, nearly 78x its daily average volume.

6.      Within days, market participants began to question the validity of Defendants' claim emphasizing they had found a 100% "cure" for COVID-19.  Before the market opened on May 20, 2020, Viceroy Research published a note entitled "Sorrento's Predatory Propaganda."   Viceroy noted "[w]e believe Sorrento deliberately rides the pandemic wave for the sole purpose of pumping its stock price, with a propaganda machine to match."   Viceroy further observed that Sorrento's recent claim of having a "cure" for COVID-19 dovetailed with the Company's recent announcement of selling up to $250 million in an at-the-market stock offering in order to "capitalize on the destruction of the pandemic."  Indeed, Sorrento was in desperate need of cash in May 2020, given its ambitious COVID-19 plans and a balance sheet

1  burdened with nearly $100 million in expensive (7.0% interest rate), "lender of last
2  resort" debt.

3      7.   During the early morning trading hours of May 20, 2020, Hindenburg
4  Research issued a note that characterized Defendants' "cure" claims as a "too good to
5  be true" story and "very hyped."  As result of the publications of the Hindenburg and
6  Viceroy Research notes on the morning of May 20, the Company's stock price sagged
7  from a high of $6.82 per share on May 19, 2020, to $4.55 by approximately 10:15
8  a.m., Eastern.

9      8.   Undaunted by the Hindenburg and Viceroy's criticisms, and for the
10 purpose of stopping the resulting fall in the Company's stock price, Defendants
11 doubled-down on their deception.  At 10:30 a.m., Eastern, Defendants appeared on
12 Yahoo! Finance and proclaimed "'***So you have the antibody that can prevent the
13 virus from infecting healthy cells***,'" and assured investors that Sorrento was not
14 engaged in a stock "'pump and dump'" scheme.  Defendants' Yahoo! Finance
15 appearance on May 20, 2020 had its intended effect: The Company's stock price
16 reversed direction and increased in value to close the day at $5.70 per share.

17     9.   Defendants had ample reason to deceive investors in May 2020.  In
18 March 2020, the Company's independent auditor had issued a "going concern"
19 qualification to its 2019 audit opinion given, *inter alia*, Sorrento's high cash burn rate
20 and its over-leveraged capital structure.  The Company also warned in the 2019 Form
21 10-K that it may have to shut down operations if it could not raise sufficient financing
22 for its day-to-day operations.  The holder of Sorrento's high interest debt – Oak Tree
23 Capital Management, L.P. ("Oaktree") – required Sorrento to raise certain amounts of
24 outside capital ***and*** to make debt repayment obligations in 2020.  And, Defendants
25 took advantage of the artificial inflation in the Company's stock price caused by their
26 false claim that Sorrento had a "cure" for COVID-19.  During the second quarter of
27 2020, Sorrento raised over $67 million in the at-the-market common stock offering,
28 and used those proceeds to retire the unpaid balance of the Oaktree loan.

10.   On May 22, 2020, at approximately 9:15 a.m. Eastern, *BioSpace* published an article entitled "Sorrento Responds to Criticism of COVID-19." *BioSpace* noted:

> What makes this story particularly newsworthy, especially outside the bubble of biopharma and life science journalism, is the COVID-19 pandemic.
>
> At no point in the BioSpace article or during the initial interview did Ji or Brunswick refer to or use the word "cure" to describe their research.  In a FOX News interview, however, Ji is quoted as saying "We want to emphasize that there is a cure.  There is a solution that works 100%."
>
> Several analysts and media pounced, partly because Sorrento's stock immediately climbed from $2.62 per share to $9.96 per share, before it dropped back down to $5.23[on May 19, 2020].

*BioSpace* reported that it provided Defendants the opportunity to address their May 15, 2020 public proclamations about STI-1499, and Defendants "insist[ed] that they did not say [STI-1499] was a cure."  Yet, Defendants' attempt to explain what they really meant served to admit that their May 15, 2020 claims were false and misleading.   Specifically, Defendants clarified that STI-1499 "might be" or "potentially" could be a cure and, in any event, the drug could not "cure late-stage patients."  Hindenburg Research responded, noting that Sorrento's CEO "walked back his comments about having a cure . . . .  We encourage regulators to investigate any stock sales."  In reaction to this news, the Company's stock price dropped from a daily high of $5.35 per share, to a daily low of $4.67, or 12.7%, on over 48 million shares traded.

**JURISDICTION AND VENUE**

11.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

13.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because a significant portion of Defendants' actions, and the subsequent damages, took place within this District.

14.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone communications and the facilities of national securities exchanges.

**PARTIES**

**Plaintiff**

15.     Andrew Zenoff, a resident of California, purchased Sorrento common stock during the Class Period on the Nasdaq and was damaged thereby.  *See* ECF No. 9-4.

**Defendants**

16.     Sorrento is a Delaware corporation that describes itself as a clinical stage and commercial biopharmaceutical company focused on delivering therapies to patients and their families to address unmet medical needs.  At all relevant times, the Company purportedly leveraged its proprietary "G-MAB" technology to create therapeutics to treat, for instance, cancer and SARS-CoV-2 (a/k/a the coronavirus). The Company has professed that its current mission is to leverage its expertise in developing targeted antibodies for cancer "to create best-in-category treatments and diagnostics to ease suffering and assist in the global response to COVID-19." Sorrento's principal offices are located at 4955 Directors Place, San Diego, CA

4822-3071-0241.v1

92121.  Founded in 2009, Sorrento has not achieved marketing approval of any drug that it has developed internally.  Sorrento is a control person of defendants Ji and Brunswick within the meaning of §20(a) of the Exchange Act.

17.     Henry Ji, Ph. D. ("Ji") co-founded Sorrento and served as President, CEO and Chairman of the Board of Directors throughout the Class Period.  According to the Company's 2020 Form 10-K, Ji has "more than 18 years of biotechnology and biopharmaceutical experience [and] extensive knowledge of the industry in which we operate . . ."  Further, the 2020 Form 10-K touted Ji's "unique role in our day-to-day operations as our President and Chief Executive Officer [which provides] a broad understanding of the operational and strategic issues we face."  Since 2001, Ji has served in senior executive positions at several biopharmaceutical companies (both public and private).  Ji earned a B.S. in Biochemistry from Fudan University and earned his Ph. D. in Animal Physiology from the University of Minnesota.  Ji holds several issued and pending patents in the life sciences field and is the sole inventor of Sorrento's intellectual property.

18.     Prior to and during the Class Period, Ji was responsible for complying with the Company's Code of Business Conduct and Ethics for Employees, Executive Officers and Directors (the "Code").  According to the Code, it is the policy of Sorrento to promote "high standards of integrity by conducting Sorrento's affairs in an honest and ethical manner."  Further, the Code makes clear that "[o]beying the law, both in letter and spirit, is the foundation of this Code. . . .  Disregard of the law will not be tolerated."  The Code specifically prohibits any employee, executive or Board member from "knowingly" making any false or misleading statement or "knowingly" omitting any information necessary to make a disclosure accurate in all material respects.  The Code also prohibits causing or encouraging any other person to make a materially false statement or omission.  Lastly, the Code warns:

> Any employee who violates the standards in this Code may be subject to
> disciplinary action, which, depending on the nature of the violation and

1     the history of the employee, may range from a warning or reprimand, up

2     to and including termination of employment relationship or removal

3     from Sorrento's Board of Directors and, in appropriate cases, civil legal

4     action or referral for regulatory or criminal prosecution.

5          19.     Ji made or had authority over the content and dissemination of the false

6     and misleading statements and omissions set forth herein at ¶¶43-44, 48, and is liable

7     for those false statements and omissions.  Ji is also a control person of Sorrento within

8     the meaning of §20(a) of the Exchange Act.

9          20.     Mark R. Brunswick, Ph. D. ("Brunswick") joined Sorrento in January

10    2017 and currently serves as Senior Vice President, Regulatory Affairs.  Brunswick

11    has over three decades of experience in senior positions in the "Regulated Industry,"

12    including nine years at the FDA, Center for Biologics, Division of Monoclonal

13    Antibodies.  Before joining Sorrento in 2017, Brunswick served as the head of

14    regulatory affairs at Sophiris Bio and Arena Pharmaceuticals, and led the regulatory

15    group at Elan Pharmaceuticals.  Brunswick earned his B.S. and Ph.D. from the

16    University of London.

17         21.     Prior to and during the Class Period, Brunswick was responsible for

18    complying with the Company's Code.  According to the Code, it is the policy of

19    Sorrento to promote "high standards of integrity by conducting Sorrento's affairs in an

20    honest and ethical manner."  Further, the Code makes clear that "[o]beying the law,

21    both in letter and in spirit, is the foundation of this Code. . . .  Disregard of the law

22    will not be tolerated."  The Code specifically prohibits any employee, executive or

23    Board member from "knowingly" making any false or misleading statement or

24    "knowingly" omitting any information necessary to make a disclosure accurate in all

25    material respects.  The Code also prohibits causing or encouraging any other person to

26    make a materially false statement or omission.  Lastly, the Code warns:

27         Any employee who violates the standards in this Code may be subject to

28         disciplinary action, which, depending on the nature of the violation and

4822-3071-0241.v1

1    the history of the employee, may range from a warning or reprimand, up

2    to and including termination of employment relationship or removal

3    from Sorrento's Board of Directors and, in appropriate cases, civil legal

4    action or referral for regulatory or criminal prosecution.

5        22.    Brunswick made or had authority over the content and dissemination of

6    the false and misleading statements and omissions set forth herein at ¶¶43-44, and is

7    liable for those false statements and omissions.  Brunswick is also a control person of

8    Sorrento within the meaning of §20(a) of the Exchange Act.

9        23.    Sorrento, Ji and Brunswick are referred to herein collectively as the

10   "Defendants."

11                          **FACTUAL BACKGROUND**

12   **Sorrento's Business**

13       24.    Sorrento is a biopharmaceutical company in the business of creating

14   antibody treatments for various diseases and conditions.  The Company's business

15   centers on its proprietary "G-MAB" antibody library, which, according to the

16   Company, contains one quadrillion fully-human antibodies that can be developed into

17   pharmaceutical products.  While Sorrento's business focuses on using the antibody

18   library to develop cancer treatments, the Company also develops products for pain

19   treatment and autoimmune disease.  Most recently, it has begun to focus on COVID-

20   19.  The Company is currently developing 11 COVID-19-related products – three

21   diagnostic products and eight potential treatments – that are in various stages of

22   development and clinical testing.  None have received FDA approval.

23       25.    Sorrento has never obtained FDA approval to market any product that it

24   created.  The Company's only commercially viable product is a non-opioid pain

25   management drug called ZTlido, which Sorrento obtained when it acquired the

26   pharmaceutical company, Scilex, in November 2016.  Because Sorrento's business

27   generates minimal product-related revenue, it relies on public and private financing to

28

4822-3071-0241.v1

1  survive.  As the Company warned in its regulatory filings with the SEC prior to and
2  during the Class Period:

> We have principally financed our operations through underwritten public
> offerings and private debt and equity financings, as we have not
> generated any significant product related revenue from our principal
> operations to date, and do not expect to generate significant revenue for
> several years, if ever.  We will need to raise additional capital before we
> exhaust our current cash resources in order to continue to fund our
> research and development, including our plans for clinical and
> preclinical trials and new product development, as well as to fund
> operations generally.  We will seek to raise additional funds through
> various potential sources, such as equity and debt financings or through
> corporate collaboration and license agreements.  We can give no
> assurances that we will be able to secure such additional sources of funds
> to support our operations, or, if such funds are available to us, that such
> additional financing will be sufficient to meet our needs.

17     26.     When the COVID-19 pandemic hit in 2020, Sorrento began leveraging its
18  G-MAB antibody library to enter the COVID-19 space.  According to the Company,
19  the G-MAB library contains "one quadrillion" fully-human monoclonal antibodies.
20  Antibodies are proteins that human bodies make in order to fight viruses, and
21  monoclonal antibodies are antibodies that are made in a laboratory and act like natural
22  antibodies to limit the amount of virus in the body.  When the pandemic struck,
23  Sorrento stated that its goal was to leverage its expertise in producing fully-human
24  monoclonal antibodies, as well as its extensive G-MAB library, to develop and create
25  the "best-in-category treatments and diagnostics to ease suffering and assist in the
26  global response to COVID-19."

27     27.     There was one significant hurdle, however, standing between the
28  Company's goal of leveraging its purported expertise in producing antibody

4822-3071-0241.v1

treatments to assist in the global response to COVID-19.  Sorrento desperately needed cash and the Company's ability to raise sufficient amounts was critical.   In the Company's 2019 Form 10-K (filed with SEC on March 3, 2020), Defendants revealed that its independent auditor had issued a "going concern" qualification to its 2019 audit of Sorrento's financial statements.  Deloitte & Touche LLP's report observed "the Company's negative working capital, recurring losses from operations, recurring negative cash flows from operations and substantial cumulative net losses raise doubt about [Sorrento's] ability to continue as a going concern."  In the 2019 Form 10-K, Defendants added: "[w]e cannot be certain that additional funding will be available on acceptable terms, or at all," and warning, "[i]f we are unable to raise additional capital . . . we may have to significantly delay, scale back or discontinue the development or commercialization of one or more of our product candidates."

**The COVID-19 Pandemic**

28.     In March 2020, the World Health Organization announced that COVID-19 could "be characterized as a pandemic." Since then, COVID-19, the disease caused by a novel coronavirus named SARS-COV-2, has created a global health crisis of epic proportions.  So far, COVID-19 has caused over 2.6 million recorded deaths globally, with over 540,400 recorded deaths in the United States alone.  The virus has already resulted in over 118 million recorded infections to date, with nearly 30 million infections in the United States.

**Potential Market for COVID-19 Antibody Treatments**

29.     The Virus had never been identified in human beings before the ongoing global outbreak, and, before vaccinations began, every one of the estimated 7.8 billion people on the planet was potentially at risk of COVID-19.  This was true even of those people who had already been infected and had recovered, as it was unknown whether, and for how long, previous infection with the virus prevented further infection in an individual.  Demand for an antibody treatment started shortly after COVID-19 was

1    declared a global pandemic, and starting in March 2020, multiple companies had

2    already begun working to develop antibody treatments.

3         30.    Poised with its G-MAB library, Sorrento decided to enter the market for a

4    COVID-19 antibody treatment.  According to Defendant Ji, the Company placed a

5    "strategic bet[] on the discovery and development of potent neutralizing antibodies

6    against the virus and its potential emerging variance trends as a treatment and

7    prevention solution to combat COVID-19 pandemic."

8    **Sorrento's COVID-19 Antibody Treatment – STI-1499**

9         31.    Beginning in mid-February 2020, Sorrento began screening its one

10   quadrillion antibodies in search of one that could be effective to treat COVID-19.  On

11   May 8, 2020, the Company announced a partnership with Mt. Sinai Health System to

12   develop "COVI-SHIELD," which was planned to be a cocktail of three antibodies that

13   would potentially block and neutralize COVID-19 infection.  According to Defendant

14   Ji, the Company screened "about a billion" antibodies and selected roughly one dozen

15   that had shown "some neutralizing activity" against the COVID-19 virus.  One of

16   those dozen was an antibody called STI-1499.

17        32.    On May 15, 2020, Defendant Ji was interviewed by Fox News and

18   claimed that Sorrento had developed a "cure" for COVID-19.  When announcing the

19   Company's discovery of the STI-1499 antibody, Ji stated, "'We want to emphasize

20   there is a cure.  There is a solution that works 100 percent,'" and "'[i]f we have the

21   neutralizing antibody in your body, you don't need the social distancing.  You can

22   open up a society without fear.'"

23   **Approval Process for STI-1499**

24        33.    An antibody treatment can be used in the United States only if it is

25   approved by the FDA.  Various requirements must typically be met for approval,

26   including going through multiple stages of preclinical and clinical testing.  The

27   approval process starts in the preclinical phase, in which the treatment undergoes

28   animal and laboratory testing to address basic safety concerns.  Once the treatment

moves beyond the preclinical stage, it enters three phases of clinical testing.  In Phase I, a small number of participants are given the treatment to test primarily for safety, and sometimes signs of effectiveness are observed.  Serious side effects can stop the treatment approval process at this point.  If the treatment goes on to Phase II, hundreds of volunteers are administered the treatment to test effectiveness and further test safety.  In Phase III, thousands of participants typically receive the treatment to further test efficacy and safety.  After the Phase III, the FDA thoroughly reviews all of the submitted data related to the treatment and decides whether to approve it.

34.     When Sorrento claimed it had found a cure, STI-1499 was in the early stages of preclinical testing.  The Company was testing antibodies *in vitro* (a petri dish or test tube) to determine whether any could potentially block SARS-CoV-2 infection. The FDA had not cleared STI-1499 to move beyond the preclinical stage and into Phase I clinical testing, and the antibody had neither passed basic safety tests nor been tested in humans.

**Relevant Study Results and Statistics**

35.     During the testing process for STI-1499, Defendants emphasized its neutralizing activity and potency.  If an antibody demonstrates neutralizing activity against a virus, it neutralizes any effect the virus would have had on the cell, which renders the virus non-harmful.  A higher potency means that the antibody neutralizes the virus at a lower dose.  High potency is important because, according to the Company, it "'enable[s] efficient manufacturing and ultimately result[s] in higher affordability for patients.'"  In other words, the higher the potency, the more quickly the company can manufacture the treatment, and the cheaper it is for patients.  Given the state of emergency presented by COVID-19, the Company and other market participants were also focused on how quickly antibody treatments could progress through testing to approval and then be rapidly manufactured.

36.     While Sorrento repeatedly ensured investors of the 100% neutralizing activity and high potency of its antibodies, market participants focused elsewhere –

namely, on other companies with antibodies much further along the approval process than Sorrento.  For example, while STI-1499 remained in the early stages of testing in October 2020, Regeneron and Eli Lilly had already passed all three phases of clinical testing and had requested Emergency Use Authorization from the FDA.   By December 2020, the FDA had approved both Eli Lilly's and Regeneron's antibody treatments, while Sorrento's was still in the pre-clinical testing stage (*i.e.*, *in vitro*) and had not yet even received the FDA's approval to begin Phase I clinical trials.  News media and the public focused on these and a handful of other companies whose treatments were quickly coming to the market, while public discussion about STI-1499 fizzled in the weeks after the May 15 "cure" announcement.

**STI-1499 Pre-Clinical Study Status**

37.    On March 31, 2020, Sorrento announced that it had entered into an agreement with the University of Texas Medical Branch at Galveston to begin the preclinical testing of Sorrento's COVID-19 treatment candidates.  That preclinical work involved testing Sorrento's antibodies to determine if any had the ability to inhibit SARS-CoV-2 infection.  On May 15, 2020, Sorrento announced preliminary results of the preclinical testing.  According to Sorrento, experiments showed that STI-1499 was able to "completely block" SARS-CoV-2 infection in healthy cells *in vitro* (in a petri dish or test tube).

38.    After the Class Period, on September 28, 2020, Sorrento announced the pre-clinical results for COVI-GUARD (STI-1499).  The study was titled, "Discovery and Development of Human SARS-CoV-2 Neutralizing Antibodies using an Unbiased Phage Display Library Approach."  According to the Company, the study found that, when tested in hamsters, STI-1499 demonstrated "potent neutralizing activity" against both SARS-CoV-2 and the more contagious variant D614G.  Importantly, the study states that during the process of testing STI-1499, some cells produced antibodies with a much greater ability to bond to SARS-CoV-2, which led to a 50-fold increase in neutralizing potency.  Through this process, the antibody STI-2020 was discovered,

1    and it is now the "optimized" version of STI-1499.  When the Company announced

2    the preclinical results, it referred to STI-2020 as its "'most promising SARS-CoV-2

3    antibody so far.'"  STI-2020 has replaced STI-1499 in COVI-SHIELD, although STI-

4    1499 is still being developed as COVI-GUARD.

5        39.    On September 16, 2020, Sorrento announced that its COVI-GUARD

6    antibody treatment was going to be entering Phase I clinical testing.  The title of the

7    Phase I study was, "Study to Evaluate STI-1499 (COVI-GUARD) in Patients With

8    Moderate COVID-19." The study was estimated to start in September 2020 and end

9    January 2021, and it was designed to evaluate the safety, pharmacokinetics

10   (absorption and elimination), and efficacy of a single dose of STI-1499.  However, as

11   of January 2021, Sorrento had silently withdrawn the study from the Phase I Trial

12   because the Company could not recruit enough volunteer study participants.

13       40.    Although the withdrawal status has been available on the government's

14   clinical trial webpage since at least January 8, 2021, the Company has not provided an

15   update to investors regarding the status of the trial, nor has it informed investors that it

16   had to withdraw the trial because it was unable to recruit study participants.  However,

17   on the Company's Form 10-K filed with the SEC on February 19, 2021, the Company

18   stated that it was currently in "a Phase I study of COVI-GUARD in hospitalized

19   patients with COVID-19." No further update has since been given regarding the

20   withdrawal status of the study or whether the Company plans to begin a different

21   study.  COVI-SHIELD – the cocktail antibody treatment in which STI-2020 replaced

22   STI-1499 – currently remains in the preclinical stage as the Company searches for

23   viable antibodies to add to the cocktail.

24       41.    During two recent presentations, Sorrento appeared to have forgotten

25   about STI-1499 and COVI-GUARD altogether.  For example, when discussing the

26   Company's COVID-19 pipeline at the January 11, 2021 H.C. Wainwright BioConnect

27   Conference, Defendant Ji discussed COVI-AMG and COVI-DROPS (two STI-2020

28   products) when discussing the Company's COVID-19 treatments, but not once

mentioned the status or existence of COVI-GUARD, STI-1499, or COVI-SHIELD. Again on January 20, 2021, at the B. Riley Securities' Oncology Investor Conference, the Company discussed its COVID-19 pipeline status and products, but neglected to mention either COVI-GUARD or STI-1499.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS

42. The Class Period begins on May 15, 2020. All alleged actionable statements are set forth below in **bold and italics**.

43. On May 15, 2020, at approximately 10:30 a.m. Eastern, Fox News published a news article about Sorrento entitled "California biopharmaceutical company claims coronavirus antibody breakthrough." The article included quotes attributed to Ji and Brunswick regarding the STI-1499 antibody:

> A California-based biopharmaceutical company claims to have discovered an antibody that could shield the human body from the coronavirus and flush it out of a person's system within four days, Fox News has exclusively learned.
>
> Later Friday, Sorrento Therapeutics will announce their discovery of the STI-1499 antibody, which the San Diego company said can provide a "100% inhibition" of COVID-19, adding that a treatment could be available months before a vaccine hits the market.
>
> "***We want to emphasize there is a cure.  There is a solution that works 100 percent***," Dr. Henry Ji, founder and CEO of Sorrento Therapeutics, told Fox News.  "***If we have the neutralizing antibody in your body, you don't need the social distancing.  You can open up a society without fear***."

*       *       *

1  Through further testing, the researchers at Sorrento found that
2  there was one particular antibody that showed to be 100 percent effective
3  in blocking COVID-19 from infecting health [sic] cells – STI-1499.
4  *      *      *
5  Dr. Mark Brunswick, senior vice president of Sorrento, said that
6  developing antibody treatments may be more effective in quickly
7  combating the coronavirus.  While a vaccine treatment can take up to 18
8  months, effective anti-body treatment can become available in much less
9  time and with a much higher success rate.  He points out, however, that a
10 quick approval from the Food and Drug Administration would be needed
11 to make the antibody treatment available within months.

12  "*As soon as it is infused, that patient is now immune to the*
13 *disease*," Dr. Brunswick said to Fox News.  "*For the length of time, the*
14 *antibody is in that system.  So, if we were approved [by the FDA] today,*
15 *everyone who gets that antibody can go back to work and have no fear*
16 *of catching COVID-19*."

17  44.     On May 15, 2020, *BioSpace* published an article entitled "Sorrento IDs
18 Antibody Against COVID-19 That Appears 100% Effective."  In the article Ji was
19 quoted as stating, "'We're actually so impressed with the data. . . .  *One of the*
20 *antibodies is so powerful that at a very low concentration it is able to 100%*
21 *completely prevent infection or inhibit the infection*.'"  The article quoted Brunswick
22 as claiming, "'*So what we've done is identified an antibody that recognizes the*
23 *COVID-19 virus and completely inhibits its binding to the specific receptor*.'"  The
24 article further noted that Defendants expected very large demand for STI-1499,
25 reaching as much as tens of millions of doses.

26  45.     The market reacted positively to Defendants' May 15, 2020 statements.
27 Sorrento's stock opened the trading day at $4.41 per share and rose to an intraday high
28 of $9.00.  Sorrento's stock price closed the day at $6.76, representing a 158.0%

4822-3071-0241.v1

1    increase compared to the May 14, 2020 closing price of $2.62.   The effect of
2    Defendants' May 15, 2020 statements continued on May 18, 2020, when Sorrento's
3    stock price reached a high of $10.00 per share, representing a 262.3% increase
4    compared to the May 14, 2020 closing price of $2.62.  On May 15 and May 18, 2020,
5    over 811 million shares of Sorrento common stock changed hands on the Nasdaq.  In
6    the 30-days leading up to Defendants' May 15, 2020 statements, the Company's stock
7    traded an average of approximately 6.5 million shares per day.

8         46.    Defendants' May 15, 2020 statements characterizing STI-1499 as a
9    "cure" for COVID-19, "able to 100 % completely prevent [or inhibit] infection" and
10   claiming that if people take the drug, they can go back to work "and have no fear of
11   catching COVID-19," or "[y]ou can open up a society with no fear," were materially
12   false and misleading when made.  In fact, Ji later admitted as much in an interview
13   provided to *BioSpace* on May 22, 2020.  *BioSpace* reported that Ji first "insist[ed] that
14   [Defendants] did not say [STI-1499] was cure" on May 15, 2020, and quoted Ji's *post-*
15   *hoc* explanation of what Defendants should have said.  According to Ji, Defendants
16   meant to say:

17        "[I]f [STI-1499] gets through safety studies, if it demonstrates efficacy, it
18        potentially is a cure [and] [a]fter virus infection, if it blocks the virus
19        from replicating in healthy cell continuously, you might have a cure.  We
20        cannot cure late-stage patients, on ventilators, because of all the other
21        comorbidities and complications . . . ."

22        47.    Defendants' May 15, 2020 false and misleading statements materially
23   mislead investors.  By May 2020, the coronavirus epidemic had presented itself as
24   both a global health and economic crisis, and market participants were increasingly
25   focused on statements made by pharmaceutical companies developing treatments and
26   vaccines (and thereafter invested billions of dollars into those entities).  As one
27   securities analyst later remarked, Defendants' May 15, 2020 statements were "exactly
28   what everyone in the world wanted to hear."

4822-3071-0241.v1

48.     On May 20, 2020, shortly before trading commenced and in the early moments of the trading day, security analysts published criticisms of Defendants' Class Period claims that STI-1499 was a cure for COVID-19.  The criticisms resulted in downward pressure on the Company's stock price.  Accordingly, on May 20, 2020, at approximately 10:15 a.m. Eastern, Ji appeared live on Yahoo! Finance to tamp down market concerns.  In doing so, Ji doubled-down on the assertion that STI-1499 prevented coronavirus infection and dismissed that he was hyping the Company's stock:

> ***So, you have the antibody that can prevent the virus from infecting healthy cells***. . . .  If you have a real product, eventually the stock is going to be reflecting the assets you have.  And we believe right now probably there's a lot of investor [sic] excited about this story.  However, there is a lot of investor [sic] suspecting this is another pump and dump, which is typical, which is normal, but we don't believe that's the case.

49.     Ji's May 20, 2020 statement "you have the antibody that can prevent the virus from infecting healthy cells" was materially misleading when made for the same reasons stated at ¶46.  Further, because Ji's explanation was set in the context of Defendants' May 15, 2020 "cure" claims and investors' reaction to those statements, Defendants were under a legal obligation to disclose what they knew all along:  STI-1499 was not a 100% cure for COVID-19.

50.     Ji's May 20, 2020 statement that STI-1499 could "prevent" infection from COVID-19 had its intended effect.  As the Company's stock price began to drop in the early hours of trading, and after Ji appeared on Yahoo! Finance, Sorrento's stock price increased from the trading day low of $4.55 per share, and closed at $5.70.  During the day, over 113 million shares of Sorrento common stock changed hands.

## DISCLOSURE OF DEFENDANTS' FRAUDULENT CONDUCT

51.     On May 20, 2020, at approximately 9:40 a.m. Eastern, Hindenburg Research published an equity analyst report criticizing Defendants' May 15, 2020

1    claims of a 100% "cure," and characterized them as "very hyped."  Viceroy Research,

2    in an analyst report published shortly before the market opened on May 20, 2020,

3    noted that Sorrento was engaging in "predatory propaganda" by continuing its "long

4    history of unsuccessfully tailgating fads while squandering hundreds of millions in

5    fresh investment capital."  Viceroy Research further described Sorrento as a company

6    that "deliberately rides [a] pandemic wave for the sole purpose of pumping its stock

7    price, with a propaganda machine to match."

8         52.    In reaction to Hindenburg and Viceroy's criticisms, on May 20, 2020, the

9    Company's stock price dropped to a low of $4.55 per share, reflecting a 16.1%

10   decrease from the prior day's closing price of $5.42.  As a result of Ji's appearance on

11   Yahoo! Finance at 10:15 a.m. Eastern, however, the Company's stock price began a

12   steady increase in price and closed at $5.72.

13        53.    On May 22, 2020, at approximately 9:15 a.m. Eastern, *BioSpace*

14   published an article entitled "Sorrento Responds to Criticism of COVID-19

15   Neutralizing Antibodies," which was based on a May 21, 2020 interview with Ji and

16   Brunswick.  During the interview, Ji lied again by "insist[ing] that they did not say

17   [STI-1499] was a cure" on May 15, 2020.  Ji, however, did concede Hindenburg and

18   Viceroy's main points – *i.e.*, Defendants had misleadingly hyped STI-1499 as a cure –

19   by acknowledging the drug "potentially" or "might be" a cure, and that STI-1499

20   would not "cure the late-stage patients, on ventilators, because of all the other

21   comorbidities and complications."  Hindenburg Research issued a tweet shortly

22   thereafter, noting "[t]he $SRNE CEO walked back his comments about having a cure.

23   . . . We encourage regulators to investigation any stock sales" between May 15 and

24   May 22, 2020.

25        54.    In reaction to the May 22, 2020 *BioSpace* disclosures, the Company's

26   stock price dropped from daily high of $5.35 per share, to a daily low of $4.67 per

27   share.

28

# ADDITIONAL ALLEGATIONS OF SCIENTER

**Sorrento's At-the-Market ("ATM") Stock Offering**

55.    For years leading up to 2020, Sorrento repeatedly informed investors that the Company would need to continue to raise capital to fund its operations.  The Company had "not generated any significant product-related revenue from [its] principal operations to date, and [did] not expect to generate significant revenue for several years, if ever." Obtaining financing to support the Company's operations was critical.  As reported recently in the Company's 2019 Form 10-K:

> As a result of our recurring losses from operations, recurring negative cash flows from operations and substantial cumulative losses, there is uncertainty regarding our ability to maintain liquidity sufficient to operate our business effectively, which raises substantial doubt about our ability to continue as a going concern.  If we are unsuccessful in our efforts to raise outside financing, we may be required to significantly reduce or cease operations . . . .

56.    By the end of the first quarter of 2020, the Company had cash and equivalents of only $21.9 million, and its average quarterly operating cash flow burn rate for the preceding four quarters was $41.7 million, which indicates that the Company was quickly diminishing its remaining resources.  The Company was also dangerously debt-heavy.  As stated in its 2019 Form 10-K:

> As of December 31, 2019, we had an accumulated deficit of $659.8 million.  We continue to incur significant research and development and other expenses related to our ongoing operations.  We have incurred operating losses since our inception, expect to continue to incur significant operating losses for the foreseeable future, and we expect these losses to increase. . . .

57.    With no material source of revenue in the foreseeable future and expenses mounting, Sorrento's continued existence relied upon the amount of capital

4822-3071-0241.v1

1  it could raise through public and private financing arrangements.  According to the

2  Company's 2019 Form 10-K, in order to continue its business, Sorrento "need[ed] to

3  obtain additional financing from time to time and [could] choose to raise additional

4  funds through . . . public or private equity or debt financing" that could "be dilutive to

5  [its] stockholders."

6          58.    Dangerously low on funding, Sorrento launched an ATM offering to fund

7  its continued operations.  In an ATM, the issuer places its new shares into the market

8  incrementally, through broker-dealers, at market prices.  In the traditional follow-on

9  offering, a fixed number of shares is sold at a fixed price in a single batch.  When an

10 issuer places its new shares into the market at market prices, rather than at fixed

11 prices, the issuer stands to raise more funds if its market price is higher.

12         59.    On March 13, 2020, Sorrento filed a shelf-registration statement on a

13 Form S-3 with the SEC.  It authorized the Company to, "from time to time in one or

14 more offerings," sell up to $1 billion in securities.  On March 20, 2020, the shelf-

15 registration became effective.  On April 27, 2020, the Company entered into a sales

16 agreement with Alliance Global Partners ("AGP"), pursuant to which AGP was

17 authorized to sell, in ATM offerings, up to $250,000,000 of Sorrento's stock.  On

18 April 27, 2020, Sorrento filed a supplemental prospectus with the SEC.  The

19 supplemental prospectus stated that Sorrento had entered into the sales agreement with

20 AGP, and that any sales made pursuant to the agreement would be made in sales

21 deemed to be ATM offerings, and that the sales would be determined by market prices

22 of Sorrento's stock.

23         60.    With its funding arrangement in place, Sorrento moved at a rapid pace.

24 On March 8, 2020 – merely eleven days after filing the AGP prospectus – Sorrento

25 announced that it had partnered with Mt. Sinai Health System to develop the COVI-

26 SHIELD antibody cocktail.  Then, seven days later, Defendants announced that

27 Sorrento had found a "cure" for COVID-19 when they discovered STI-1499, which

28 caused its stock price to skyrocket.

4822-3071-0241.v1

61.    Meanwhile, during the second quarter of 2020 – the quarter in which Sorrento falsely claimed it had discovered a COVID-19 cure, and in which the market price for its stock increased 144% – the Company sold an aggregate of 11,262,597 shares of its common stock pursuant to the ATM for aggregate net proceeds of approximately $62.7 million.

**Sorrento's Purchase Agreement with Arnaki, Ltd.**

62.    On the same day that Sorrento issued its April 27 prospectus for the ATM offering, it also issued a prospectus stating it was offering up to 250 million shares of its common stock to Arnaki Ltd. ("Arnaki") pursuant to a purchase agreement (the "Purchase Agreement").  Under the Purchase Agreement, Sorrento had the right to direct Arnaki to purchase up to 650,000 shares of Sorrento's common stock per business day, and the purchase price was to equal 97.5% of the daily volume weighted average purchase price of the common stock on the purchase date.  In other words, Sorrento's proceeds from any sales made pursuant to the Purchase Agreement were determined by the market price of Sorrento's stock on any given day – if Sorrento directed Arnaki to purchase shares when Sorrento's market price was higher, Sorrento stood to make more money.

63.    During the second quarter of 2020 – the quarter in which Sorrento falsely claimed it had discovered a COVID-19 cure, and in which the market price for its stock increased 144% – the Company sold an aggregate of 923,077 shares of its common stock pursuant to the Arnaki Purchase Agreement for aggregate net proceeds of approximately $4.3 million.

**Elimination of High-Interest Debt**

64.    Not only were Defendants motivated to mislead investors because the Company desperately needed operating capital, but Defendants were further motivated to raise significant amounts of cash for the purpose of eliminating tens of millions of dollars in high interest debt.

4822-3071-0241.v1

65.     In November 2018, the Company entered into a $100 million term loan agreement with Oaktree.  Oaktree is a private equity concern that has often been characterized as a lender of last resort, which, as the name implies, frequently charges high interest rates to loan money to cash-strapped companies.  In May 2019, an amendment was made to the Oaktree loan in which Oaktree lent Sorrento an additional $20 million.  In late 2019, another amendment was made to the Oaktree loan.  As part of that amendment, Sorrento "committed to meet minimum capital-raising and debt repayment requirements . . . and to pursue debt restructuring arrangements . . . ."  After deducting loan costs, commissions, fees and expenses, Sorrento received $100.2 million in net proceeds from the Oaktree loan between 2018 and 2019.  The interest on the Oaktree loan was approximately 7.0%.

66.     Between December 31, 2019 and February 28, 2020, Sorrento repaid $37.0 million of the outstanding principal balance of the Oaktree loan.  In exchange, Sorrento would no longer have to maintain any cash in a "debt service reserve account or the blocked liquidity account," but again "committed to meet minimum capital-raising and debt repayment requirements. . . ."  By May 7, 2020, Sorrento had repaid a total of $60.5 million of the $120 million outstanding principal on the Oaktree loan.

67.     But for the artificial inflation in Sorrento's stock price caused by Defendants' false claim that STI-1499 was a "cure" for COVID-19, the Company would not have been able, or would have found it much more challenging, to: (a) raise the amount of funding it did in the ATM; (b) comply with its commitments to Oaktree "to meet minimum capital-raising and debt repayment requirements"; and (c) retire the Oaktree loan.

## LOSS CAUSATION/ECONOMIC LOSS

68.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive investors and the market and a course of conduct that artificially inflated the price of Sorrento common stock.  Defendants' conduct also operated as a fraud or deceit on Class Period purchasers of Sorrento common stock by

misrepresenting and omitting material information about the clinical potential of the antibody treatment known as STI-1499.  When Defendants' prior misrepresentations and omissions were disclosed to the market, beginning on May 20, 2020, Sorrento's stock price fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of Sorrento common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

69.     Defendants' misleading statements and omissions of material facts, identified herein at ¶¶43-44, 48, had the intended effect and caused Sorrento's stock price to trade at artificially inflated prices during the Class Period.  As a direct result of the May 20 and May 22, 2020 disclosures, as detailed at ¶¶51-54, Sorrento's stock price suffered significant declines.

70.     The disclosures during the early morning of May 20, 2020, as detailed at ¶¶51-52, had a direct impact on the Company's stock price.  During the morning of May 20, 2020, the price of Sorrento's common stock fell 16.1%, from $5.42 per share at the prior day's close to $4.55 at approximately 9:15 a.m. Eastern:



71.    The disclosures during the early morning of May 22, 2020, as detailed at ¶¶53-54, had a direct impact on the Company's stock price.  Between 9:30 and 10:01 a.m. Eastern on May 22, 2020, the price of Sorrento's stock fell 12.7%, from the daily high of $5.35 per share to the daily low of $4.67 per share.

72.    The economic losses suffered by Plaintiff and other members of the Class were a direct result of Defendants' fraudulent scheme to inflate Sorrento's stock price and the subsequent declines in value of that stock when Defendants' prior misrepresentations and omissions were revealed.

## PRESUMPTION OF RELIANCE

73.    Plaintiff and the Class are entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because, during the Class Period, Sorrento common stock traded in an efficient market

1   on the Nasdaq, the material misstatements and omissions alleged herein would induce

2   a reasonable investor to misjudge the value of Sorrento common stock and without

3   knowledge of the misrepresented or omitted material facts, Plaintiff and other

4   members of the Class purchased or acquired Sorrento common stock between the time

5   Defendants misrepresented and failed to disclose material facts about the status of

6   STI-1499 antibody development and the time the true facts were disclosed.

7   Accordingly, Plaintiff and other members of the Class relied, and are entitled to have

8   relied, upon the integrity of the market for Sorrento common stock, and are entitled to

9   a presumption of reliance on Defendants' materially false and misleading statements

10  and omissions during the Class Period.

11       74.     Plaintiff and the Class are also entitled to a presumption of reliance under

12  *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims

13  asserted herein against Defendants are predicated upon omissions of material fact for

14  which there was a duty to disclose.

15                           **CLASS ACTION ALLEGATIONS**

16       75.     Plaintiff brings this action as a class action pursuant to Rule 23 of the

17  Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or

18  otherwise acquired the common stock of Sorrento between May 15, 2020 and May 21,

19  2020, inclusive (the "Class").  Excluded from the Class are Defendants and their

20  families, the officers and directors of Sorrento, members of their immediate families

21  and their legal representatives, heirs, successors or assigns, and any entity in which

22  Defendants have or had a controlling interest.

23       76.     The members of the Class are so numerous that joinder of all members is

24  impracticable.  The disposition of their claims in a class action will provide substantial

25  benefits to the parties and the Court.  Throughout the Class Period, Sorrento common

26  stock was actively traded on the Nasdaq, one of the largest stock exchanges in the

27  world.  While the exact number of Class members is unknown to Plaintiff at this time

28  and can only be ascertained through appropriate discovery, Plaintiff believes that there

4822-3071-0241.v1

are thousands of members in the proposed Class.  During the Class Period, there were more than 181 million shares of Sorrento common stock outstanding and the average daily trading volume was over 307 million shares.  Record owners and other members of the Class may be identified from records maintained by Sorrento or its transfer agent(s) and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

77.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by Defendants' acts, omissions and common scheme to defraud as alleged herein;

(b)    Whether statements made by Defendants to the investing public during the Class Period misrepresented and omitted material facts about STI-1499; and

(c)    Whether members of the Class have sustained damages and the proper measure of damages.

78.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages as a result of Defendants' wrongful conduct.

79.    Plaintiff will adequately protect the interests of the Class and has retained counsel who is experienced in securities and class action litigation.  Plaintiff has no interests which conflict with those of the Class.

80.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for all members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

3:20-cv-00966-AJB-DEB

4822-3071-0241.v1

**COUNT I**

**For Violation of §10(b) of the Exchange Act and Rule 10b-5
Against All Defendants**

81.     Plaintiff incorporates ¶¶1-80, by reference.

82.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and concealed material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

83.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Sorrento securities during the Class Period.

84.     In addition to the duties of full disclosure imposed on Defendants as a result of their affirmative false and misleading statements to the public, Defendants had a duty to promptly disseminate truthful information with respect to Sorrento's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market prices of the Company's common stock would be based on truthful, complete, and accurate information.   SEC Regulations S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*).

85.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their respective

purchases of Sorrento common stock during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for Sorrento securities and experienced losses when the artificial inflation was released from Sorrento securities as a result of the revelations and prices decline detailed herein.  Plaintiff and the Class would not have purchased Sorrento securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

86.     By virtue of the foregoing, Defendants have each violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

### COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

87.     Plaintiffs incorporate ¶¶1-86, by reference.

88.     Ji and Brunswick acted as controlling persons of Sorrento within the meaning of §20(a) of the Exchange Act.  Sorrento controlled all of its employees, including Ji and Brunswick.  By virtue of their high-level positions, and their ownership and contractual rights, and awareness of the development status of STI-1499, as well as their intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, Ji and Brunswick had the power to influence and control, and did influence and control, directly or indirectly, the Company's decision-making, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Ji and Brunswick participated in published interviews regarding the status of STI-1499 and/or prepared and approved Defendants' statements to the press, described herein at ¶¶43-44, 48, all alleged by Plaintiff to be false and misleading.

89.     Ji and Brunswick had direct and supervisory involvement in the Company's day-to-day operations and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations

as alleged herein, and exercised the same.  By reason of such conduct, Ji and Brunswick are liable pursuant to §20(a).

90.    Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Sorrento common stock during the Class Period.

### PRAYER FOR RELIEF

A.    Determining that this action is a proper class action, and certifying Lead Plaintiff as a Class representative under Federal Rule of Civil Procedure 23 and Lead Plaintiff's counsel as Class counsel;

B.    Awarding compensatory damages in favor of Lead Plaintiff and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the federal securities laws, in an amount to be proven at trial including interest thereon;

C.    Awarding Lead Plaintiff and the Class their reasonably costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such equitable, injunctive or other and further relief as the Court may deem just and proper, including, but not limited to rescission.

### JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

DATED:  April 5, 2021

ROBBINS GELLER RUDMAN
  & DOWD LLP
TRIG R. SMITH
NICOLE O. GILLILAND

s/ Trig R. Smith
TRIG R. SMITH

4822-3071-0241.v1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
trigs@rgrdlaw.com
ngilliland@rgrdlaw.com

Lead Counsel for Lead Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on April 5, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Trig R. Smith
TRIG R. SMITH

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  trigs@rgrdlaw.com

4822-3071-0241.v1

3:20-cv-00966-AJB-DEB

**Mailing Information for a Case 3:20-cv-00966-AJB-DEB Wasa Medical Holdings v. Sorrento Therapeutics, Inc. et al**

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  MAlbert@rgrdlaw.com,MAlbert@ecf.courtdrive.com

- **Rachele R Byrd**
  byrd@whafh.com,salas@whafh.com,cabrera@whafh.com,loutsenhizer@whafh.com

- **Edward Philip Dietrich**
  edward@dstlegal.com

- **Melissa Fortunato**
  fortunato@bespc.com,ecf@bespc.com

- **Robert J. Gralewski , Jr**
  Bgralewski@kmllp.com,fbrizuela@kmllp.com

- **Benjamin Heikali**
  bheikali@faruqilaw.com,ealdo@faruqilaw.com,rglezakos@faruqilaw.com,smarton@faruqilaw.com,jnassir@faruqilaw.com,ecf@faruqilaw.com,tpeter@faruqilaw.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,tcrockett@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com,jkehoe@pomlaw.com

- **Adam C. McCall**
  amccall@zlk.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,jalieberman@pomlaw.com,ahood@pomlaw.com,tcrockett@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.c

- **Ira M Press**
  ipress@kmllp.com,lmorris@kmllp.com

- **Peter M Stone**
  peterstone@paulhastings.com,joycekernan@paulhastings.com,nanettecosentino@paulhastings.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)